RECORD NUMBER: 14-4079

# United States Court of Appeals

### *for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RAMOTH JEAN,

*Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# OPENING BRIEF OF APPELLANT

REBECCA S. COLAW
REBECCA S. COLAW, P.C.
2470 Pruden Boulevard
Suffolk, Virginia 23434
(757) 539-5020

*Counsel for Appellant*

CP COUNSEL PRESS • VA – (800) 275-0668

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF JURISDICTION........................................................... 1

STATEMENT OF THE ISSUES................................................................ 2

STATEMENT OF THE CASE.................................................................... 2

    Course of Proceedings ........................................................................ 2

    Statement of Facts................................................................................ 7

ARGUMENTS AND AUTHORITIES ...................................................... 14

    I.    THE GOVERNMENT'S REPRESENTATION IN THE *STATEMENT OF FACTS* INCORPORATED INTO THE *PLEA AGREEMENT* CLAIMING THAT IT HAD 747 DAMAGED INDIVIDUALS WAS A MISREPRESENTED INDUCEMENT TO ENTER THE CONTRACT AS THE GOVERNMENT HAS ONLY IDENTIFIED 200-300 FRAUDULENT RETURNS; AS SUCH THE GOVERNMENT BREACHED JEAN'S DUE PROCESS RIGHTS AND THE CLAUSES ARE VOID........ 14

    Standard of Review............................................................................. 14

    Summary of Argument ....................................................................... 15

    Argument ............................................................................................ 15

        a.    The clause in JEAN's plea agreement as to damages was misrepresented and should be stricken from the contract. ................................................................ 21

        b.    Action for fraudulent inducement is not limited to formation of contract.................................................. 24

i

Issue I Conclusion.............................................................................. 25

II.    THE DISTRICT COURT ERRED BY IMPROPERLY
       CALCULATING THE GUIDELINES IN AN INFLATED
       MANNER AS THE INCREASE TO THE LOSS TABLE
       ARE NOT BASED ON EMPIRICAL DATA ......................... 26

Standard of Review........................................................................... 26

Summary of the Argument ............................................................... 28

Argument .......................................................................................... 28

       a.     The guidelines range is inflated and should be
              accorded less deference than the other sentencing
              factors as it is not based on empirical data ................... 32

       b.     The increases to the guidelines do not aid the
              purposes of sentencing.................................................. 37

Issue II Conclusion ........................................................................... 40

III.   THE DISTRICT COURT ERRED IN DETERMINING A
       SENTENCE ON AN ESTIMATED GUESS AS TO
       DAMAGES WITHOUT A SUFFICIENT FACTUAL
       FOUNDATION AND ALLOWED ADDITIONAL
       ESTIMATED LOSSES NOT CHARGED IN THE
       INDICTMENT ..................................................................... 41

Standard of Review........................................................................... 41

Summary of the Argument ............................................................... 41

Argument .......................................................................................... 42

       a.     The loss amount should not include damages from
              any alleged victim except Turbo Tax or the
              specifically identified individuals in the Superseding
              Indictment ..................................................................... 43

ii

b.      The victims identified in this matter. ............................ 47

c.      The historical practice of federal judges supports the principle that a showing of causation linking the specific offense to the victim's harm is integral to an award of restitution. ....................................................... 48

ISSUE III Conclusion ......................................................... 55

OPENING BRIEF CONCLUSION ............................................... 56

STATEMENT REGARDING ORAL ARGUMENT ................................. 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Ashmore v. Herbie Morewitz, Inc,*
    252 Va. 141, 475 S.E. 2d 271 (1996) .................................................. 25

*Correale v. United States,*
    479 F.2d 944 (1st Cir. 1973)........................................................ 18, 19

*Dolan v. U.S. Postal Service,*
    546 U.S. 481, 126 S. Ct. 1252, 163 L. Ed. 2d 1079 (2006) .............. 54

*Gall v. United States,*
    552 U.S. 38, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007) ...... *passim*

*Hughey v. United States,*
    495 U.S. 411, 109 (1990) .......................................................... 49, 52

*In re Doe,*
    264 F. App'x 260 (4th Cir. 2007)...................................................... 52

*Kimbrough v. United States,*
    552 U.S. 85 (2007)........................................................ 28, 31, 34, 30

*Mabry v. Johnson,*
    467 U.S. 504 (1984)................................................................ *passim*

*Nelson v. United States,*
    555 U.S. 350, 129 S. Ct. 890 (2009) .................................................. 31

*Palermo v. Warden, Green Haven State Prison,*
    545 F.2d 286 (2d Cir. 1976) ............................................................. 18

*Rita v. United States,*
    551 U.S. 338, 127 S. Ct. 2456 (2007) .................................... 30, 31, 33

*Santobello v. New York,*
    404 U.S. 257, (1971)............................................................ 18, 19, 21

*Shelton v. United States,*
    246 F.2d 571 (CA5 1957) ................................................................ 20

*Spears v. United States,*
    555 U.S. 261, 129 S. Ct. 840 (2009) ........................................... 31, 36

*United States v. Abu Ali,*
    528 F.3d 210 (4th Cir. 2008) ........................................................ 26

*United States v. Aguirre-Gonzalez,*
    597 F.3d 46, 2010 WL 700201 (1st Cir. 2010) ................................. 53

*United States v. Bailey,*
    975 F.2d 1028 (4th Cir. 1992) ....................................................... 52

*United States v. Berk,*
    666 F. Supp. 2d 182 (D. Me. 2009) ................................................ 49

*United States v. Blake,*
    81 F.3d 498 (4th Cir. 1996) .......................................................... 26

*United States v. Booker,*
    543 U.S. 220, 125 S. Ct. 738 (2005) .............................................. 26

*United States v. Bowler,*
    585 F.2d 851 (7th Cir. 1978) ........................................................ 18

*United States v. Bruchey,*
    810 F.2d 456 (4th Cir. 1987) ........................................................ 41

*United States v. Carter,*
    454 F.2d 426 (4th Cir. 1972) .................................................... 17, 18

*United States v. Chalupnik,*
    514 F.3d 748 (8th Cir. 2008) ........................................................ 53

*United States v. Church,*
    701 F. Supp. 2d 814 (W.D. Va. 2010) ................................... 49, 50, 51

*United States v. Conner*,
  930 F.2d 1073 (4th Cir. 1991) ........................................................... 15

*United States v. Crusco*,
  536 F.2d 21 (3d Cir. 1976) ................................................................. 18

*United States v. Daughtrey,*
  874 F.2d 213 (4th Cir. 1989) ............................................................. 26

*United States v. Emmenegger*,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................................... 36

*United States v. Harvey*,
  791 F.2d 294, 301 (4th Cir. 1986) ............................................... *passim*

*United States v. Henoud*,
  81 F.3d 484, 488 (4th Cir. 1996) ....................................................... 52

*United States v. Lewis*,
  606 F.3d 193 (4th Cir. 2010) ............................................................. 27

*United States v. Llamas*,
  No. 09-4045, 599 F.3d 381,
  2010 U.S. App. LEXIS 5509 (4th Cir. March 17, 2010) ............. 53, 54

*United States v. Martin*,
  25 F.3d 211 (4th Cir. 1994) ............................................................... 14

*United States v. McQueen*,
  108 F.3d 64 (4th Cir. 1997) ............................................................... 16

*United States v. Newsome*,
  322 F.3d 328 (4th Cir. 2003) ............................................................. 53

*United States v. Pauley*,
  511 F.3d 468 (4th Cir. 2007) ............................................................. 27

*United States v. Roper,*
  462 F.3d 336 (4th Cir. 2006) ............................................................. 53

*United States v. Serhant*,
    740 F.2d 548 (7th Cir. 1984) .............................................................. 50

*United States v. Shelby*,
    573 F.2d 971 (7th Cir. 1978) .............................................................. 50

*United States v. Snow*,
    234 F.3d 187 (4th Cir. 2000) .............................................................. 14

*United States v. Soc'y of Indep. Gas. Marketers*,
    624 F.2d 461 (4th Cir. 1979) .............................................................. 20

*United States v. Speed*,
    53 F.3d 643 (4th Cir. 1995) ........................................................... 14, 15

*United States v. Stuver*,
    845 F.2d 73 (4th Cir. 1988) ................................................................ 50

*United States v. Taylor*,
    305 F.2d 183 (4th Cir. 1962) ......................................................... 49, 50

*Ware v. Scott*,
    220 Va. 317, 257 S.E.2d 855 (1979) .................................................. 24

**Rules and Statutes:**

18 U.S.C. § 981 .......................................................................................... 3

18 U.S.C. § 982 .......................................................................................... 3

18 U.S.C. § 1028A(a)(l) ............................................................................. 3

18 U.S.C. § 1029(a)(2) ............................................................................... 3

18 U.S.C. § 1029(a)(3) ............................................................................... 3

18 U.S.C. § 1341 ........................................................................................ 3

18 U.S.C. § 1342 ........................................................................................ 3

18 U.S.C. § 1349 ........................................................................................ 3

18 U.S.C. § 2259 ................................................................................ 54

18 U.S.C. § 2259(b)(3) ....................................................................... 55

18 U.S.C. § 2259(c) ........................................................................... 55

18 U.S.C. § 3231 .................................................................................. 1

18 U.S.C. § 3553(a) ....................................................................... *passim*

18 U.S.C. § 3553(a)(2) ........................................................................ 29

18 U.S.C. § 3651 ........................................................................... 49, 50

18 U.S.C. § 3663A .............................................................................. 52

18 U.S.C. § 3663(a)(1)(A) .................................................................. 51

18 U.S.C. § 3663(a)(2) ....................................................................... 51

18 U.S.C. § 3742(a) ............................................................................ 27

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 991(b)(1)(A) .................................................................... 33

28 U.S.C. § 991(b)(1)(B) .................................................................... 33

28 U.S.C. § 991(b)(1)(C) .................................................................... 33

28 U.S.C. § 994 ................................................................................... 33

U.S.S.G. § 2A2.2(b)(2)(B) ................................................................. 36

U.S.S.G. § 2A2.2 (b)(3)(C) ................................................................ 36

U.S.S.G. § 2B1.1 ....................................................... 32, 34, 36, 43

U.S.S.G. § 2B1.6 .................................................................................. 3

U.S.S.G. § 2B1.1(b)(1) ................................................................ 33

U.S.S.G. § 2B1.1(b)(10)(C) ..................................................... 5, 4, 32

U.S.S.G. § 2B1.1(b)(11)(C)(ii) .................................................... 3, 5

U.S.S.G. § 2B3.1(b)(2)(B) ........................................................ 35

U.S.S.G. § 2D1.1(a)(5)(7) ......................................................... 36

U.S.S.G. § 2F1.1 ............................................................... 34, 43

U.S.S.G. § 2G1.3(a)(4) ............................................................ 36

U.S.S.G. § 2K1.4(a)(1) ............................................................ 35

U.S.S.G. App. C (1989) ........................................................... 35

U.S.S.G., App. C (2001) .......................................................... 35

U.S.S.G., ch. 1, pt. 4(d) (1987) .................................................. 38

Fed. R. App. P. 4(b) ............................................................... 1

**Other Authorities:**

Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity:*
*An analysis of Recent Research (1999)*
     http://members.lycos.co.uk/lawnet/SENTENCE.PDF ................. 38, 39

*Crime Control Act of 1990,*
     *Pub. L. No. 101-647 § 2509, 104 Stat. 4789, 4863* ............................ 51

David Weisburd et al., *Specific Deterrence in a Sample of Offenders*
*Convicted of White Collar Crimes,*
     33 Criminology 587 (1995) ............................................... 39

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds*
*After Booker,*
     20 FED. SENT. R. 167 (2008) ............................................. 37

Michael Tonry, *Purposes and Functions of Sentencing*,
    34 Crime & Just. 1 (2006) ................................................................ 38

Restatement (Second) of Contracts § 206 (1981) ........................................ 19

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing:
An Assessment of How Well the Federal Criminal Justice System is
Achieving the Goals of Sentencing Reform* (Nov. 2004) ............................ 37

U. S. Sentencing Commission, *Supplementary Report on the Initial
Sentencing Guidelines and Policy Statements* (1987)
    www.fd.org/pdf_lib/Supplementary%20Report.pdf ......................... 33

Westen & Westin, *A Constitutional Law of Remedies for Broken Plea
Bargains*,
    66 Calif. L. Rev. 471 (1978) ................................................................ 16

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:
Restorative Justice and White Collar Crime*,
    8 Cardozo J. Conflict Resol. 421 ................................................. 38, 39

## PRELIMINARY STATEMENT

In this opening brief, Appellee, the United States, is "the Government," and the Appellant, RAMOTH JEAN is "JEAN." Appellant sites references to the Joint Appendix as "(J.A.___)."

## STATEMENT OF JURISDICTION

I. <u>Subject Matter Jurisdiction</u>. "[T]he courts…shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231 (2006).

II. <u>Appellate Jurisdiction</u>. This court shall have jurisdiction of appeals from all final decisions of the federal courts except where the Supreme Court affords direct review. 28 U.S.C. § 1291 (2006).

Appeal is from a final judgment of the United States Court for the Eastern District of Virginia, Richmond Division, in a criminal case pursuant to Fed. R. App. P. 4(b), Title 28 U.S.C. § 1291. Defendant did file a timely *Notice of Appeal* pursuant to Fed. R. App. P. 4(b). (J.A.748). Defendant filed a *Notice of Appeal* on January 23, 2014.

<u>**STATEMENT OF THE ISSUES**</u>

**I.   THE GOVERNMENT'S REPRESENTATION IN THE STATEMENT OF FACTS INCORPORATED INTO THE PLEA AGREEMENT CLAIMING THAT IT HAD 747 DAMAGED INDIVIDUALS WAS A MISREPRESENTED INDUCEMENT TO ENTER THE CONTRACT AS THE GOVERNMENT HAS ONLY IDENTIFIED 200-300 FRAUDULENT RETURNS; AS SUCH THE GOVERNMENT BREACHED JEAN'S DUE PROCESS RIGHTS AND THE CLAUSES ARE VOID.**

**II.  THE DISTRICT COURT ERRED BY IMPROPERLY CALCULATING THE GUIDELINES IN AN INFLATED MANNER AS THE INCREASE TO THE LOSS TABLE ARE NOT BASED ON EMPIRICAL DATA.**

**III. THE DISTRICT COURT ERRED IN DETERMINING A SENTENCE ON AN ESTIMATED GUESS AS TO DAMAGES WITHOUT A SUFFICIENT FACTUAL FOUNDATION AND ALLOWED ADDITIONAL ESTIMATED LOSSES NOT CHARGED IN THE INDICTMENT.**

<u>**STATEMENT OF THE CASE**</u>

**I.   <u>Course of Proceedings</u>**

The criminal process began against JEAN by Criminal Complaint filed on May 14, 2013 by a U.S. Postal Inspector. (J.A.10).

The Government indicted JEAN on August 6, 2013 on an eight-count indictment alleging Conspiracy to Commit Mail and Wire Fraud, Access Device Fraud, Aggravated Identity Theft, and Criminal Forfeiture Allegation. (J.A.25).

The Government filed a superseding indictment on September 4, 2013, modifying the charges to Conspiracy to Commit Mail and Wire Fraud in violation

2

of 18 U.S.C. § 1349 (Count I); Mail Fraud in violation of 18 U.S.C. §§ 1341, 2 (Counts 2-11); Use of Unauthorized Access Device in violation of 18 U.S.C. § 1029(a)(2); (Count 12); Possession of Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3) (Count 13); Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(l) (Counts 14-16); and Criminal Forfeiture Allegation in pursuant to 18 U.S.C. §§ 981, 982.

JEAN entered into a *Plea Agreement* (J.A.76) with an accompanying *Statement of Facts* (J.A.87) on October 8, 2013. He pled guilty to Counts 1 and 16 of the *Superseding Indictment* to wit: Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, 18 U.S.C. § 1349 and Aggravated Identity Theft, in violation of Title 18, United States Code, *id.* § 1028A(a)(l). (J.A.76.).

JEAN filed his *Position on Sentencing* on December 23, 2013 objecting to the two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(ii) for possession of five or more means of identification that unlawfully were produced from or obtained by the use of, another means of identification. JEAN based his objection on the fact that JEAN had also pled guilty to Aggravated Identity Theft, claiming U.S.S.G. § 2B1.6 applied. (J.A.95). JEAN also filed a *Motion for a Downward Variance* on December 23, 2013 arguing similar grounds as he stated in the *Position on Sentencing*.(J.A.100).

3

The Government filed its *Position on Sentencing* on December 26, 2013, stating no objection to the content of the *Pre-Sentence Investigation Report* (PSR) (J.A.251) or to the calculation of the 78-97 month advisory sentencing range as to Count 1 and the 24 month restricted range as to Count 16 stating it did not seek sentences outside those ranges. (J.A.105).

The Government filed its *Motion for Downward Adjustment in Guideline Range Pursuant to U.S.S.G. § 3E1.1(b)* on December 26, 2013. (J.A.109).

The Government filed its response to JEAN's motion for downward variance on January 3, 2014 requesting the district court deny the motion for variance. (J.A.111).

The Government then filed its *Supplemental Pleading Regarding Application of Sophisticated Means Enhancement* on January 6, 2014. (J.A.118). Its reasoning for the filing was that the final *PSR* filed December 26, 2013 applied the sophisticated means enhancement pursuant to United States Sentence Guideline (U.S.S.G.) Section 2B1.1(b)(10)(C) at the request of the government. (J.A.118). (J.A.271). However, the initial PSR filed on December 5, 2013 (J.A.224) had not applied that enhancement. JEAN's counsel registered an objection to application of the sophisticated means enhancement with the probation officer. (J.A.269). JEAN's sentencing position (J.A.95) however, did not address application of that enhancement, because it was filed on December 23, and JEAN's counsel had left

4

town for the holidays before the filing of the final PSR on December 26. (J.A.118). JEAN's counsel, who returned to the office on January 6, 2014, advised the Government that he did indeed intend to litigate the sophisticated means enhancement. (J.A.119).

However, JEAN filed his *Supplemental Position with Respect to Sentencing Factors and Motion for a Downward Variance* Sentence on January 7, 2014 stating Defendant's prior objection, filed December 23, 2013, to the two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(ii) appears resolved by agreement of the U.S. Attorney, U.S. Probation, and defense counsel as the enhancement does not appear in the final PSR. (J.A.126). Defense counsel withdrew his objection to the "sophisticated means" enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) without explanation. (J.A.123). JEAN, agreed that the applicable guideline range is 78-97 months with a mandatory 24 months consecutive JEAN again moved for a downward variance for the reasons stated in his motion filed on December 23, 2013. (J.A.124).

The district court entered Judgment in the matter on January 9, 2014, finding JEAN guilty on Counts 1 and 16 of the *Superseding Indictment*. (J.A.174). On the Government's motion, the district court dismissed the *Indictment* and Counts 2-15 of the *Superseding Indictment*. (J.A.174) (J.A.171). The court sentenced JEAN to a total term of 114 months. (J.A.175). This term consists of 90 months on Count 1

and 24 months on Count 16, to be served consecutively.  (J.A.175).  JEAN filed his notice of appeal on January 23, 2014.(J.A.180).  The district court sentenced Jean on a restitution amount, which not yet calculated by the Government. (J.A.178)(J.A.170).

There were numerous motions filed in district court after JEAN noted his appeal.   On March 14, 2014, the Government filed its *Motion to Extend Time for Entry of Restitution Judgment*, which the district court granted and extended the filing time until June 3, 2014. (J.A.142)(J.A.188). The Defense made no input. On May 27, 2014, the Government filed a *Supplemental Pleading Regarding Calculation of Restitution* stating that the district court should order restitution for $628,513.07.   (J.A.189). The Defense made no input.   On June 2, 2014, the Government filed its *Second Motion to Extend Time for Entry of a Restitution Judgment* (J.A.211)*, which* the district court granted on June 3, 2014 and extended the time for entry of restitution until July 2, 2014. (J.A.214). The Defense made no input. On June 3, 2014, JEAN's trial counsel Mark Tyndall wrote the court a letter stating that since JEAN's sentencing, the relationship between JEAN and him had deteriorated to the point where there is no productive communication.  (J.A.215). Tyndall requested that Elizabeth Hanes of the Federal Public Defender's office be appointed to represent JEAN in the *Government's Supplemental Pleading Regarding Calculation of Restitution* and related matters. (J.A.215)The district

6

court ordered the appointment of Elisabeth Hanes on June 4, 2014. It ordered restitution be entered no later than July 2, 2014, despite having already sentenced JEAN. (J.A.216).

On June 30, 2014, JEAN's new counsel Hanes filed *Defendant's First Motion to Extend Time for Entry of Restitution Judgment and Request for Hearing*. (J.A.217). The district court granted the motion on July 2, 2014 and set a hearing for August 22, 2014. (J.A.223). The district court additionally ordered extension for entry of an order on restitution judgment until August 27, 2014. (J.A.223). The restitution matter has not yet concluded in district court.

**JEAN RESPECTFULLY REQUESTS PERMISSION AND RESERVES THE RIGHT TO FILE A SUPPLEMENTAL BRIEF WHEN THE DISTRICT COURT MATTER IS FINALLY CONCLUDED**

## II.    <u>Statement of Facts</u>

The parties stipulated in the *Statement of Facts* that the allegations contained in Counts 1 and 16 of the *Superseding Indictment* were true. (J.A.87).  From November 18, 2011, to June 21, 2013, the exact dates being unknown, in the Eastern District of Virginia, JEAN conspired with others unknown to execute and attempt to execute a scheme to defraud and to obtain property by materially false means. (J.A.87). In furtherance of this conspiracy, JEAN used the United States mails to transmit writings, signs, and signals affecting interstate and foreign commerce. (J.A.87).

7

On or about August 25, 2012, JEAN possessed and used the identification of another person's pre-paid debit card bearing the individual name of L.A.  JEAN used that debit card to withdraw funds in the amount of $503.00 from a Virginia credit union automated teller machine. (J.A.88).

On January 28, 2012, an individual falsely representing himself as **D.A**., a resident of Miramar, Florida, rented Unit 415 at West End Self-Storage in Henrico County, Virginia. The person depicted in a surveillance photograph taken at the time of the rental was not JEAN. (J.A.88).

On August 6, 2012, the monthly rent on Unit 415 was delinquent. On August 24, 2012, a West End Self Storage employee contacted **D.A**., who advised him that he had not rented the unit. Several hours later, a telephone payment was made toward the delinquent rent payment using the number from a pre-paid debit card bearing the name of **R.S.** that had been issued via TurboTax. Turbo Tax issued the pre-paid debit card in connection with the filing of a fraudulent tax return in **R.S.'s** name and the receipt of a fraudulent tax refund. (J.A.88).

On August 25, 2012, JEAN arrived at Unit 415. To access the unit, JEAN used a computer access password for the facility and the key or combination to the lock that secured Unit 415. Upon JEAN's arrival, a West End Storage employee notified the Henrico County Police. (J.A.88).

When Henrico County Police Officer Stuart Von Canon arrived, JEAN was leaving a car with a box. (J.A.88). Officer Von Canon asked JEAN why he was at the facility. JEAN replied he lived in Florida and he had traveled via train from Florida to Boston about three weeks ago to stay at a cousin's house while the cousin was away. (J.A.89). According to JEAN, he had then taken the train from Boston to Richmond the previous day. (J.A.89). JEAN's stated purpose for this trip was to retrieve the box from the storage unit to ship to an unnamed acquaintance in Boston. (J.A.89).

Officer Von Canon asked JEAN for consent to search his person, which JEAN granted. (J.A.89). The ensuing search yielded a Turbo Tax pre-paid debit card bearing the name of **L.A**. (J.A.89). Officer Von Canon found the card in JEAN's left shoe. (J.A.89). JEAN acknowledged that he had taken the card out of his wallet and placed it in his shoe when he saw Officer Von Canon arrived at the unit. JEAN told Von Canon, "I knew I would get in trouble if you found it." JEAN claimed that **L.A.** was his cousin; however, he was unable to provide any contact information for her. (J.A.89).

Officer Von Canon sought a state arrest warrant for JEAN on an identity theft charge, but the state magistrate refused to issue it because Von Canon had been unable to contact **L.A.** for confirmation that JEAN did not have permission to

9

use or possess the debit card. (J.A.89). Therefore, Von Canon drove JEAN to the hotel where he was then staying.  (J.A.89).

JEAN did not retain any items from the storage unit.  (J.A.89).  Von Canon and Detective Christopher Maher, of the Henrico County Police Department, obtained search warrants that allowed them to search the box and the storage unit. Those searches yielded hundreds of index cards bearing the names, dates of birth, and social security numbers of individuals from around the country.  These index cards also bore notations such as "TurboTax," "Accepted," and "Rejected," as well as various street addresses, including addresses in the Richmond, Virginia, metropolitan area.   (J.A.89).   Many index cards were attached to pre-paid debit cards issued in the name of the person on the card.   The search also yielded printed on-line job applications apparently submitted by individuals via the Internet. (J.A.90).

In one of the seized boxes was a receipt bearing JEAN's name that reflected a payment for a rental of an Extended Stay Hotel room in Pompano Beach, Florida in November 2011. (J.A.90).   In another box, police found correspondence (consisting of directions regarding use of pre-paid debit cards) that accompanied pre-paid debit cards issued by TurboTax and mailed to the different individuals at multiple addresses in Richmond, Virginia.  The individuals, identified on the cards,

10

do not live at the addresses to which the TurboTax debit cards and accompanying correspondence were mailed. (J.A.90).

The pre-paid debit cards were issued in connection with successful or abortive attempts at obtaining fraudulent tax refunds. (J.A.90). Turbo Tax issued **L.A.** debit card found on JEAN was in connection with a fraudulently filed tax return. (J.A.90). However, the card was never funded with a refund, as one was not issued. (J.A.91).

The individual identified as **R.S.'s** debit card, issued by TurboTax and funded via a fraudulently issued tax refund, was used to fund the individual identified as **L.A.'s** debit card via a transfer affected at a Walmart in Quincy, Massachusetts on August 24, 2012. (J.A.91).

On August 24 and 25, 2012, an individual matching JEAN's appearance used the **L.A.** debit card to withdraw funds in an aggregate amount exceeding $1,000.00 at several ATMs. (J.A.91). The ATMs belonged to Bank of America in Massachusetts and a Virginia Credit Union in Richmond, Virginia. The same person withdrew money for $503.00 from a Virginia Credit Union ATM on August 25, 2013. (J.A.91).

**L.A.** is not JEAN's cousin, and in fact, does not know JEAN. She had no knowledge of any successful or unsuccessful attempt at filing a tax return in her

11

name and did not authorize any such filing. (J.A.91). She also had no knowledge Turbo Tax issued the card Von Canon found on JEAN. (J.A.91).

Between November 18, 2011, and January 7, 2012, JEAN rented an Extended Stay hotel room in Pompano Beach, Florida. (J.A.91). During that time, someone used the hotel's Internet Protocol (IP) address to complete an application to complete on-line tax preparation software and to access CareerBuilder.com. (J.A.91). CareerBuilder.com is means by which personal identifying information was stolen in connection with this scheme via on-line job applications for non-existent positions. (J.A.91). Without the knowledge of the persons whose identities were stolen, the information was used to prepare and file fraudulent tax returns. (J.A.91).

In June 2013, agents traveled to Florida to affect JEAN's arrest on a criminal complaint issued by a magistrate judge of the Eastern District of Virginia. While searching for JEAN, they executed a search warrant on the apartment in which JEAN was then living. That search yielded several pre-paid debit cards issued by TurboTax, including the **R.S.** debit card referenced previously.

On June 20, 2013, JEAN, surrendered himself to agents seeking his arrest on the criminal complaint. (J.A.92). Following his arrest, he agreed to be interviewed in his attorney's presence. (J.A.92). Prior to the interview, agents advised JEAN of his Miranda rights, which he waived, agreeing to speak with them. (J.A.92).

12

The boxes JEAN removed from the storage unit contained index cards bearing 747 names of individuals often accompanied by personal identifying information. (J.A.93). Many of the index cards were also accompanied by pre-paid debit cards also bearing some of the 747 names. The parties agreed in the *Statement of Facts* that losses or intended losses associated with the 747 names were reasonably foreseeable to JEAN, as it was reasonably foreseeable that each of the names would be used to file a fraudulent tax return if the scheme proceeded according to plan. (J.A.93). Although the amounts sought in filed returns varied, the parties agreed in the *Statement of Facts* that an average sought refund amount reasonably foreseeable to JEAN was $3,000.00 per return based on representations of the Government.(J.A.93).

The parties agreed that for the purpose of calculating JEAN's sentencing range under the United States Sentencing Guidelines, that the reasonably foreseeable intended loss attributable to the defendant is $2,241,000.00 (747 names times $3,000.00 per return). (J.A.93). The parties also agreed that this case involved in excess of 250 victims. JEAN also acknowledged that this agreement as to loss is not binding on the Court. However, the Government stated at sentencing that it only had 200-300 victims and not 747. (J.A.135). However, restitution is still being disputed and is still being litigated in the district court.

## ARGUMENT AND AUTHORITIES

I.    **THE GOVERNMENT'S REPRESENTATION IN THE *STATEMENT OF FACTS* INCORPORATED INTO THE *PLEA AGREEMENT* CLAIMING THAT IT HAD 747 DAMAGED INDIVIDUALS WAS A MISREPRESENTED INDUCEMENT TO ENTER THE CONTRACT AS THE GOVERNMENT HAS ONLY IDENTIFIED 200-300 FRAUDULENT RETURNS; AS SUCH THE GOVERNMENT BREACHED JEAN'S DUE PROCESS RIGHTS AND THE CLAUSES ARE VOID.**

### Standard of Review

This Court reviews a claim that a party has breached a plea agreement under a bifurcated standard, reviewing the district court's factual findings for clear error, while reviewing the district court's application of principles of contract interpretation *de novo*. *United States v. Snow*, 234 F.3d 187, 189 (4th Cir. 2000).

Whether a presentation of evidence whose only purpose was to support a downward departure constituted a breach of the plea agreement is a question of contract interpretation which this Court reviews *de novo*. *See United States v. Martin*, 25 F.3d 211, 216-17 (4th Cir. 1994) (holding that the Government's failure to file a motion seeking a downward departure at sentencing was a question of contract interpretation requiring de novo review) (disagreement on other grounds recognized in *United States v. Speed*, 53 F.3d 643 (4th Cir. 1995)).

14

We review a district court's findings regarding "what the parties said or did" for clear error, "while principles of contract interpretation applied to the facts are reviewed de novo." *Id.* at 217.

## Summary of Argument

The Government Breached the *Plea Agreement* in stating that it had 747 damaged individuals when it in fact did not. Such statement was a fraudulent inducement to the contract. As such, the terms and clauses contained in the Plea Agreement and Statement of Facts stating restitution should be stricken from the *Plea Agreement* and *Statement of Facts* and JEAN should be resentenced.

## Argument

It is settled that a defendant alleging the Government's breach of a plea agreement bears the burden of establishing that breach by a preponderance of the evidence. *See United States v. Conner*, 930 F.2d 1073, 1076 (4th Cir. 1991). Plea agreements between the Government and a defendant are unique and call for special due process considerations while the judicial interpretation of a plea agreement is largely governed by the law of contracts. *United States v. Conner*, 930 F.2d 1073, 1076 (4th Cir. 1991). If the Government breaches express or implied terms of the plea agreement, a violation of due process occurs. *Mabry v. Johnson*, 467 U.S. 504, 509, 104 S. Ct. 2543, 81 L. Ed. 2d 437 (1984). Because violations of plea agreements on the part of the Government not only violate a

15

defendant's constitutional rights, but also involve the "honor of the Government, public confidence in the fair administration of justice, and the effective administration of justice," a breach of the agreement by the Government constitutes plain error. *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir. 1997). If the plea agreement at issue is clear and unambiguous, the agreement should be enforced as written. *United States v. Harvey*, 791 F.2d 294, 301 (4th Cir. 1986).

In *United States v. Harvey*, this Court held that "constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." *Id.* at 300-01. "This is particularly appropriate where, as will usually be the case, the Government has proffered the terms or prepared a written agreement - for the same reasons that dictate that approach in interpreting private contracts." *Id.* at 301

In the process of determining whether disputed plea agreements have been formed or performed, courts have necessarily drawn on the most relevant body of developed rules and principles of private law, those pertaining to the formation and interpretation of commercial contracts. *See generally* Westen & Westin, *A Constitutional Law of Remedies for Broken Plea Bargains*, 66 Calif. L. Rev. 471 (1978) (analyzing cases in these terms). However, the courts have recognized that those rules have to be applied to plea agreements with two things in mind, which

16

may require their tempering in particular cases. First, the defendant's underlying "contract" right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law. *See Mabry v. Johnson*, 467 U.S. at 509 (broken government promise that induced guilty plea implicates due process clause because it impairs voluntariness and intelligence of plea). Second, with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights -- to concerns for the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972).

Private law interpretive principles may be wholly dispositive in an appropriate case. For example, whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. *See Harvey*, 791 F.2d at 300. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly. *See id.* Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind. *See id.* Such an approach is conformable not only to the policies reflected in private

17

contract law from which it is directly borrowed, but also to constitutional concerns of fundamental fairness in "bargaining" for guilty pleas, *see Santobello v. New York*, 404 U.S. 257, 261, 262 (1971), and to the wider concerns expressed in the exercise of supervisory jurisdiction over the administration of federal criminal justice. *See United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972). *See Harvey*, 791 F.2d at 300.

On the other hand, both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements. *See, e.g.*, *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir. 1978) (plea agreement not appropriate context for "rigidly literal" construction of language); *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 295 (2d Cir. 1976) (government invocation of restrictive contract principles "disingenuous"); *United States v. Crusco*, 536 F.2d 21, 26 (3d Cir. 1976) (government's "strict and narrow interpretation of its commitment . . . untenable"); *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973) (government held to "meticulous standards of both promise and performance"). This is particularly appropriate where, as will usually be the case, the Government has proffered the terms or prepared a written agreement -- for the same reasons that

18

dictate that approach in interpreting private contracts. *See generally* Restatement (Second) of Contracts § 206 (1981). *See Harvey*, 791 F.2d at 300.

As a necessary corollary, derelictions on the part of defense counsel that contribute to ambiguities and imprecisions in plea agreements may not be allowed to relieve the Government of its primary responsibility for insuring precision in the agreement. *See Harvey*, 791 F.2d at 300. While private contracting parties would ordinarily be equally chargeable -- so far as enforceability and interpretation are concerned -- with their respective counsels' derelictions in negotiating commercial contracts, different concerns apply to bargained plea agreements. *See id.* Unlike the private contract situation, the validity of a bargained guilty plea depends finally upon the voluntariness and intelligence with which the defendant -- and not his counsel -- enters the bargained plea. *Mabry v. Johnson*, 467 U.S. 504 (1984). This necessary condition to effective waiver of constitutional rights can be found wanting not only because of the Government's derelictions in discharging its duty of fair bargaining, *see Santobello*, 404 U.S. at 261-62, but also because of any independent (as well as Government-induced) dereliction of defense counsel amounting to ineffective assistance of counsel. *See Correale*, 479 F.2d at 949 (Coffin, C. J.) (that defense counsel's possible dereliction may constitute constitutionally ineffective assistance of counsel invalidating guilty plea, not a "relevant legal concern" in direct proceeding in criminal case to vacate plea

because of broken plea agreement); *cf. United States v. Soc'y of Indep. Gas. Marketers*, 624 F.2d 461, 473 (4th Cir. 1979) (in interpreting disputed immunity agreement, court "not primarily concerned with the gauge of [defense counsel's] professional caution or responsibility"). *See Harvey*, 791 F.2d at 300.

It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked. *Mabry*, 467 U.S. at 508-09. It is also well settled that plea agreements are consistent with the requirements of voluntariness and intelligence -- because each side may obtain advantages when a guilty plea is exchanged for sentencing concessions, the agreement is no less voluntary than any other bargained-for exchange. *Id.* It is only when the consensual character of the plea is called into question that the validity of a guilty plea may be impaired. *Id.*

A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), **misrepresentation** (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes).'" *Id.* at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (CA5 1957) (en banc) (in turn quoting 242 F.2d 101, 115 (Tuttle, J., dissenting to panel opinion).

20

Thus, only when it develops that the defendant was not fairly apprised of its consequences can his plea be challenged under the Due Process Clause. *Santobello*, 404 U.S. 257, illustrates the point. The Court began by acknowledging that the conditions for a valid plea "presuppose fairness in securing agreement between an accused and a prosecutor. . . . The plea must, of course, be voluntary and knowing and if it was induced by promises, the essence of those promises must in some way be made known." *Id.* at 261-62. It follows that when the prosecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a **<u>false premise</u>**, and **<u>hence his conviction cannot stand</u>**: "[When] a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262.　See *Mabry v. Johnson*, 467 U.S. 504, 509 (U.S. 1984).

### a.　The clause in JEAN's plea agreement as to damages was misrepresented and should be stricken from the contract.

The Plea Agreement and *Statement of Facts* entered into on October 8, 2013 stated:

> "that the boxes JEAN removed from the storage unit contained index cards bearing 747 names of individuals from around the United States, often accompanied by personal identifying information. Many of the index cards were also accompanied by pre-paid debit cards also bearing some of the 747 names. These debit cards were issued in connection with tax refunds.  The parties agree that losses or intended losses associated with the 747 names were reasonably foreseeable to

21

JEAN, as it was reasonably foreseeable that each of the names would be used to file a fraudulent tax return if the scheme proceeded according to plan. Although the amounts sought in the fraudulently filed returns varied, the parties agree that an average sought refund amount reasonably foreseeable to JEAN was $3,000.00 per return."

(J.A.93).

However, three months later, at the sentencing hearing held on January 9, 2014, Special Agent Le Fevre testified that the Government had never identified 747 names.

**THE COURT**:    Special Agent Le Fevre, from the statement of facts here, there was approximately 747 debit cards involved here. Was the modus operandi for each of these pretty much the same as you described as to the one you recovered from Florida?

**AGENT LE FEVRE**: I guess I should clarify a little bit. We haven't recovered actually 700 debit cards at this point. We've identified over 700 names of individuals that were **presumably** stolen. And we continue to trace those back to tax returns that have been filed, and we're still trying to figure out exactly how much in tax refunds were released because, I'm sure you can appreciate this, it's a process of going from A to Z to try and --

**THE COURT:**    From your investigation, though, Agent Le Fevre, approximately how many fraudulent returns were filed based upon the names of these individuals you recovered?

**AGENT LE FEVRE:**  Well, to date **we've identified, I'd say, over 200 to 300**. We're still working that number up.

(J.A.137-138).

Therefore, the statements and totals as to numbers used in the *Plea Agreement* were a misrepresentation, which resulted in a fraudulent inducement to

22

JEAN with the Government having no actual supporting investigation or evidence. As such it was a misrepresentation of a contract term and the clauses as to restitution and damages to support the 747 names or the $3,000.00 per claim should be stricken from the *Plea Agreement* and *Statement of Facts*.

The record at this time does not state what JEAN or his counsel stated about the 747 number or corresponding $3000.00 per claim. However, it can be deduced that at that time JEAN believed that the Government had the evidence to support the *Statement of Facts* and agreed to them as it was enough to put him, over a particular sentencing threshold and under another, resulting in no objection to the sentencing restitution amounts because at that time more restitution did not make a difference in his contemplated sentencing. However, as we know, less restitution does. If JEAN had known that the Government could not prove the damages they alleged it is conceivable that he would not have agreed to the amounts in the *Plea Agreement* and *Statement of Facts.*

As evidence of the fact that the restitution was not known at the time of sentencing, the amount of restitution would not still be litigated in the district court as of the filing of this brief.

**b.    Action for fraudulent inducement is not limited to formation of contract.**

The Supreme Court of Virginia has held that "[a]n action for fraudulent inducement need not ... be limited to formation of the contract." *Ware v. Scott*, 220 Va. 317, 320, 257 S.E.2d 855, 857 (1979). In *Ware*, the seller fraudulently concealed flood damage to a house, which had occurred after the formation of the contract but before closing. The Court stated that:

> Although formation was free of fraud, performance of an executory contract may be fraudulently induced.  Such is the cause when one party fraudulently leads the other to believe that a condition precedent to the latter's duty to perform has been fulfilled.  By the same logic, fraudulent inducement to perform may arise when one party induces the other to perform by concealing some fact which excuses performance by the latter.

*Id.* (citation omitted).

This case is similar to *Ware v. Scott* in that the 747 names were identified prior to sentencing but before a restitution order was entered. JEAN was induced to enter into the Plea agreement by the Government's representation that it had 747 names which it could prove suffered damages which resulted in a certain restitution range and the resulting sentencing range.  The damages as alleged by the Government were pure speculation and JEAN was sentenced on a restitution dollar amount that the Government could not prove.  The Government should have told JEAN that it had only 200-300 names where they could prove damages.

24

(J.A.137).  This fact is clearly shown by the plethora of motions filed by the Government regarding restitution amounts still pending in the district court.

Additionally, in *Ashmore v. Herbie Morewitz, Inc*. The Supreme Court of Virginia drew a fine distinction between fraud that makes a contract void ab initio and fraud, which makes the contract voidable at the option of the defrauded party. The Court stated:

> When a promisor knows what is being signed but the promisor's consent is induced by fraud, mutual consent is present and a contact is formed, which, because of the fraud, is voidable.  In other words, 'the act of the defrauded person is operative though voidable.' Williston on Contracts, 18 U.S.C. § 1488, at 332 (3d Ed. 1970).

> On the other hand, if the fraud operates at the inception of the agreement so that the promisor actually does not know what is being signed, or does not intend to enter into a contract at all, mutual assent is lacking and the act of the promisor is void; the purported agreement may be disregarded without the necessity of recession.

(citation omitted). 252 Va. 141, 148, 475 S.E. 2d 271, 274-275 (1996).

JEAN's victim and damage amount clauses in the *Statement of Facts* and *Plea Agreement* are void because the contract was procured by a fraudulent representation as to the victims and damage amounts.  As such, they should be stricken from the contract through recession.

## **Issue I Conclusion**

The Government breached the *Plea Agreement* in stating that it had 747 damaged individuals when it in fact did not and such a statement was a fraudulent

25

inducement to the contract.  As such, the terms and clauses contained in the *Plea Agreement* and *Statement of Facts* stating restitution  and damage amounts should be stricken from the *Plea Agreement* and *Statement of Facts* and JEAN's sentence should be vacated and the matter should be remanded and JEAN resentenced.

## II.    THE DISTRICT COURT ERRED BY IMPROPERLY CALCULATING THE GUIDELINES IN AN INFLATED MANNER AS THE INCREASE TO THE LOSS TABLE ARE NOT BASED ON EMPIRICAL DATA.

### Standard of Review

The federal courts of appeals review federal sentences and set aside those they find "unreasonable." *See, e.g.*, *United States v. Booker*, 543 U.S. 220, 261-63, 125 S. Ct. 738 (2005).

"In reviewing the application of the guidelines by a district court, the appellate court examines factual determinations for clear error; legal questions, however, are subject to a de novo standard of review." *United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996).

A court reviews *de novo* the district court's interpretation of the Guidelines language. *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir. 1989).

A sentence based on an improperly calculated guidelines range will be found unreasonable and vacated. *United States v. Abu Ali*, 528 F.3d 210, 250 (4th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 50 (2007)).

26

In imposing a sentence, "a court's failure to properly calculate the advisory sentencing range is a significant procedural error that requires us to vacate the ultimate sentence…. In other words, a properly calculated guidelines range is a precondition of appellate review of a sentence's substantive reasonableness." *United States v. Lewis*, 606 F.3d 193, 203 (4th Cir. 2010).

Title 18, U.S.C. § 3742(a) grants jurisdiction over a defendant's appeal of his sentence when the defendant believes the sentence: (1) was imposed in violation of law; (2) is based on an incorrect application of the Guidelines; (3) is greater than the sentence specified in the guideline range; or (4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable. *Title 18, U.S.C. § 3742(a)*.

We review sentences for reasonableness, applying an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007); *see also United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). When imposing a sentence, a district court must: (1) properly calculate the guideline range; (2) treat the guidelines as advisory; (3) consider the factors set out in 18 U.S.C. § 3553(a) (West 2006); and (4) explain its reasons for selecting a sentence. *Pauley*, 511 F.3d at 473.

## Summary of the Argument

The guidelines range in this case adjusted for restitution is inflated and should be accorded less deference than the other sentencing factors. Additionally the guidelines do not aid the purposes of sentencing. In calculating the fraud guidelines, the Sentencing Commission failed in considering empirical evidence when making the amount of loss central to its fraud guideline and then repeatedly increasing not only the number of levels imposed for specific loss amounts, but also the number of applicable specific offense characteristics. The resulting fraud guideline is entitled to little deference and the district court erred in not giving deference to JEAN. The court also failed to adequately consider the other §3553(a) factors, and the empirical data not considered by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

## Argument

JEAN Incorporates the argument in **ISSUE I** as if restated herein.

The United States Supreme Court's opinions in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445, have dramatically altered the law of federal sentencing. While courts must continue to *consider* the sentencing guidelines, Congress has *required* federal courts to impose

the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). Those factors include:

(a) the nature and circumstances of the offense and the history and characteristics of the defendant;

(b) the kinds of sentences available;

(c) the advisory guideline range;

d) the need to avoid unwarranted sentencing disparities;

(e) the need for restitution; and

(f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See id.*

The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary,*" to comply with the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), i.e.:

(a) retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment"),

(b) deterrence,

(c) incapacitation ("to protect the public from further crimes"), and

29

(d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision." This requirement is not just another factor to be considered along with the others set forth in 18 U.S.C. § 3553(a); rather it sets an independent limit on the sentence.

Accordingly, and as the Supreme Court further explained in *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456 (2007), a district court remains free to reject the advisory sentencing range "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," or, the Court continued, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id.* at 2465, 127 S. Ct. 2456; *see also*, *Kimbrough v. United States*, 128 S. Ct. 558, 574-75 (2007) (noting that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the 'heartland' to which the [Sentencing] Commission intends individual Guidelines to apply'"). As such, according to the Supreme Court, a party may "contest[ ] the Guidelines sentence generally under 18 U.S.C. § 3553(a) - that is,

30

[he may] argu[e] that the Guidelines reflect an unsound judgment." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007).

As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a).

In two more recent summary reversals, the Supreme Court further clarified the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350, 129 S. Ct. 890 (2009); *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009) (per curiam). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in <u>Nelson</u> that "the Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Spears*, 555 U.S. 261, 129 S. Ct. 840 (emphasis in original). In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence outside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to 18 U.S.C. § 3553(a).

### a. The guidelines range is inflated and should be accorded less deference than the other sentencing factors as it is not based on empirical data.

JEAN's guidelines range is principally a function of the loss amount under U.S.S.G. § 2B1.1. The guidelines were initially calculated including restitution which had not been finalized in the district court. For sentencing, the district court set the restitution to be more than $1,000,000.00 (with intended amount $2,241,000.00) even though it continued to have hearings on the matter. (J.A.271). Even at sentencing, the Government stated it could not prove the loss that JEAN was sentenced on based on the testimony of Special Agent Le Fevre. (J.A.137). (The loss is improperly inflated discussed in **ISSUE I, and III** and incorporated herein). That amount of loss results in at least a 16-level increase to his base offense level. Were it not for this 16-level enhancement, JEAN's offense level would be 15 (7 base +6 under 2B1.1(b)(2)(C) and +2 under 2B1.1(b)(10)(C) and his advisory Guidelines range would be 18 to 24 months based on Criminal History Category I. He would still have to serve his two years on identity theft, which would give him a maximum possible sentence of 48 months. Instead, he is serving 114 months--a difference of 66 months or 5.5 years in the total time JEAN will have to serve.

While some enhancement based on loss amount should clearly apply to fraud-based offenses – including the offenses in this case – the escalating

32

enhancement in the loss table at Section 2B1.1(b)(1) is both unsupported and unreasonable and violates due process.

Although the initial Sentencing Commission Guidelines based their proposed calculation of fraud sentences on empirical data,[1] they have since failed to base several significant increases in the fraud sentencing range on similar data. This is particularly troubling because the Supreme Court's allowance of an appellate presumption of reasonableness for within-Guidelines sentences is premised entirely on the assumption that the Commission has carried out its duty to utilize empirical evidence and its analysis of the § 3553(a) factors in assigning recommended sentences to certain offenses. *See Rita*, 551 U.S. at 348, 350, 127 S. Ct. 2456 (noting the result of the Commission's carrying out its statutory duty is "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice" and that "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale").

---

[1] The Commission conducted its mission under 28 U.S.C. § 991(b)(1)(A), (B), (C) analyzing more than 10,000 PSRs and data from 100,000 federal convictions over two years. *See* U. S. Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987), at 16, *available at* www.fd.org/pdf_lib/Supplementary%20Report.pdf. From this data, the Commission ascertained "the average sentences imposed in [various] categories of cases prior to the creation of the Commission" and "independently develop[ed] sentencing range[s] . . . consistent with the purposes of sentencing described in section 3553(a)(2) of title 18." 28 U.S.C. § 994(m).

As a result, the Supreme Court has recognized that when the Commission fails to fulfill its role by premising a Guideline on considerations other than empirical evidence and the § 3553(a) factors, the sentencing court may give less deference to that Guideline. The Supreme Court's decision in <u>Kimbrough</u>, which held sentencing judges may disregard the Guidelines' sentencing recommendations for crack cocaine offenses based on their disagreement with the crack/powder cocaine sentencing disparity contained in the Guidelines, was motivated by the Commission's failure to utilize empirical evidence in enacting the crack cocaine sentencing guidelines. *See Kimbrough*, 552 U.S. at 109-10 (holding where a Guideline is not the product of "empirical data and national experience," it is not an abuse of discretion for a sentencing court to conclude the recommended sentence fails to achieve the purposes of sentencing set forth in § 3553(a), even in "a mine-run case"); *Gall*, 552 U.S. at 46 n.2, 128 S. Ct. 586, 169 L. Ed. 2d 445 ("Notably not all of the Guidelines are tied to this empirical evidence.").

The offense levels in § 2B1.1's loss table have progressively increased over the years without the support of any empirical data demonstrating the penological value of those increases.[2]

---

[2] Fraud offenses were covered by U.S.S.G. § 2F1.1 until the November 1, 2001 edition of the Guidelines. In the November 1, 2001 fraud offenses were merged into § 2B1.1. As used herein, "§ 2B1.1" collectively refers to § 2B1.1 and its predecessor, § 2F1.1.

In steadily increasing the levels contained in the loss table, the Commission failed to cite a single empirical basis for its decision.[3]

Moreover, in adopting Amendment 154, the Commission sought to conform the fraud loss table with the tax loss table without explaining why the tax loss table should itself be a model. Likewise, in adopting Amendment 617, the Commission relied on the argument that the existing loss table resulted in sentences lower than the penalty levels for offenses of similar seriousness. The Commission, however, failed to point out which offenses it deemed to be of comparable seriousness

to non-violent high-loss fraud. Indeed, by generating an offense level of 31 for JEAN (before any adjustment). The fraud Guidelines result in a level that is within a similar range to those that apply to offenses that are self-evidently of far greater seriousness, including some violent offenses. These offenses include bombing an airport or mass transit facility, see U.S.S.G. § 2K1.4(a)(1) (2010) (base offense level 24); armed robbery, see U.S.S.G. § 2B3.1(b)(2)(B) (2010)

---

[3] Two separate amendments – 154 and 617 – are responsible for nearly all of the increases to the loss table. In support of the former increase, the Commission stated only that it sought to "conform the theft and fraud loss tables to the tax evasion table" and "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." U.S.S.G. App. C, Amend. 154 (1989). And, in adopting the substantial increases in Amendment 617, the Commission merely stated that it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that the offenses sentenced [pursuant to the loss table] under-punish individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." U.S.S.G., App. C, Amend. 617 (2001).

(base offense level 20 + 6 for use of a firearm); promoting sex with a minor, see U.S.S.G. § 2G1.3(a)(4) (2010) (base offense level 24); trafficking of less than 400 kilograms of marijuana, see U.S.S.G. § 2D1.1(a)(5)(7) (2010) (base offense level 26); and aggravated armed assault resulting in life-threatening injuries, see U.S.S.G. §§ 2A2.2(b)(2)(B), (b)(3)(C) (2010) (base offense level 14 +4 + 7 for the firearm and the injuries).

Finally, although the Commission has made the amount of loss the determinative factor in the offense level calculation for fraud offenders, the specific amount of loss is often "a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting that "[h]ad [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more"). Thus, in many cases, the loss amount "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *Id.*

Because the Commission failed to cite empirical data in adjusting the loss table upward – and thus failed to fulfill its institutional role – sentencing courts have discretion to disagree, on policy grounds, with the effects of the increases imposed in § 2B1.1. *See Spears v. United States*, 129 S. Ct. 840, 844 (2009) (explaining when the Commission fails to fulfill its institutional role, a district

court can vary from the Guidelines "based on [a] policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). One author recently observed, when commenting on high-level fraud offenses:

> [S]ince *Booker*, virtually every judge faced with a top-level corporate [fraud] defendant [whose advisory Guidelines range was premised primarily upon the application of § 2B1.1's loss table] has concluded sentences called for by the Guidelines were too high. This near unanimity suggests the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines . . . and the fundamental requirement of Section 3553(a) that judges impose sentences "sufficient, but not greater than necessary" to comply with its objectives.

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 FED. SENT. R. 167, 169 (2008).

### b. The increases to the guidelines do not aid the purposes of sentencing.

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure white collar offenders faced "**short** but definite period[s] of confinement." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 56 (Nov. 2004) [hereinafter *Fifteen Year Report*]. The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained, "the definite prospect of prison, though the

37

term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch. 1, intro., pt. 4(d) (1987).

However, as noted above, the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for fraud. In the twenty years since the Guidelines were first adopted, empirical research has continued to show that while certainty has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421* , 447,-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An analysis of Recent Research (1999)*, summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the

United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Yet another study concluded: "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms." *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

In short, the Commission failed to fulfill its institutional role of considering empirical evidence when making the amount of loss central to its fraud guideline and then repeatedly increasing not only the number of levels imposed for specific loss amounts, but also the number of applicable specific offense characteristics.

39

The resulting fraud guideline is, therefore, entitled to little deference. The court erred in calculating the guidelines with an improperly inflated speculative damage amount, failed to give deference to JEAN in the fact of the lack of empirical data to support the guidelines, failed to look to the other § 3553(a) factors not considered by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. The sentence entered by the district court was an abuse of discretion and violated due process.

## Issue II Conclusion

The guidelines range in this case is inflated and improper and the court erred in not according less deference to the guidelines than the other sentencing factors as the increases to the loss table are not based on empirical data and the guidelines were calculated using an improper speculative amount. The Commission's failure to considering empirical evidence when making the amount of loss central to its fraud guideline and then repeatedly increasing not only the number of levels imposed for specific loss amounts, but also the number of applicable specific offense characteristics results in a disproportionate sentence which should be vacated and or reduced. The court also failed to look to the other § 3553(a) factors, and the empirical data not considered by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the purposes of

sentencing JEAN. The sentence should be vacated and remanded for further sentencing.

## III.    THE DISTRICT COURT ERRED IN DETERMINING A SENTENCE ON AN ESTIMATED GUESS AS TO DAMAGES WITHOUT A SUFFICIENT FACTUAL FOUNDATION AND ALLOWED ADDITIONAL ESTIMATED LOSSES NOT CHARGED IN THE INDICTMENT.

### Standard of Review

A criminal restitution order will not be overturned absent an abuse of discretion, *United States v. Bruchey*, 810 F.2d 456, 458 (4th Cir. 1987).

JEAN incorporates the standards of review in **Issue II** as if stated herein.

### Summary of the Argument

The district court erred in sentencing JEAN under a an estimated guess amount of more than $1,000,000.00 (Intended Amount: $2,241,000.00) when it was clear at sentencing that the amounts were misrepresented in the *Plea Agreement* and had not yet been determined nor had any factual evidence to support. JEAN's loss amounts used for sentencing[4] included money damages, not alleged in the indictment, nor included in the *Statement of Facts*, against different victims not named in the *Indictment* or *Superseding Indictment* as a specific victim of the charged offenses. The additional speculated funds inappropriately increased

---

[4] (loss amounts and restitution are currently under review and not concluded in the district court)

41

JEAN's guidelines, and the court's inclusion of the inappropriate damages resulted in an improper application of the guidelines. The district court sentenced JEAN on speculation damages.  Liberty should not rest on speculation.

## Argument

JEAN incorporates **ISSUE I, and II**, as if stated herein.  The district court determined a non-supportable money damage amount should be included in the sentencing despite a pending restitution order.  The district court's sentencing of JEAN's on speculative damage amounts not based on facts or evidence is error. Additionally, the excessive speculation damages influenced the court's sentence resulting in an overstatement of the guidelines resulting in an improper excessive sentence. The district court erred in sentencing JEAN under a speculative amount of more than $1,000,000.00 (Intended Amount: $2,241,000.00). The district court committed clear error by including as speculative damages (aka a guess), which did not have sufficient factual foundation, which resulted in an elevated sentence to JEAN of Level 16 when the level should have been less. (J.A.271). In addition, the speculative damages, without factual foundation, improperly included losses generated by the conspiracy in the absence of any evidence showing JEAN's involvement or that the numbers alleged were actually linked to the conspiracy in which JEAN was involved.

a.   **The loss amount should not include damages from any alleged victim except Turbo Tax or the specifically identified individuals in the Superseding Indictment.**

U.S. Sentencing Guidelines Manual § 2F1.1 application note 7 directs the sentencing judge to value losses in fraud cases in accordance with U.S. Sentencing Guidelines Manual § 2B1.1 commentary (Larceny, Embezzlement, and Other Forms of Theft). Under § 2B1.1, "loss" is defined as the value of the property taken.

The speculative damage amounts submitted by the Government prior to sentencing contained damages for dates prior to the allegations in the *Indictment* and *Superseding Indictment*. Counts one through eleven all allege the dates of the conspiracy as beginning prior to November 18, 2011, through on or about June 21, 2013. Yet in damages submitted to the court for the speculative damages for the *Plea Agreement* and restitution hearing there is $84,798.00 in amount of relief claimed (no actual damages) and $62,333.00 in amount of relief released (actual damages) that were for dates out of the purview (hereinafter "out of the purview") of the *Indictment* and *Superseding Indictment* and happened before November 18, 2011. (J.A.195-210).

## DATES OUT OF PURVIEW OF INDICTMENTS

| DATE | Amount of Restitution Claimed (Not Actual Damages) | Amount of Restitution Released (Actual Damages) |
|------|------|------|
| 2/16/2002 | $2,445.00 | $2,445.00 |
| 2/15/2011 | $3,420.00 | $0.00 |
| 3/19/2011 | $3,918.00 | $3,918.00 |
| 4/5/2011 | $5,571.00 | $5,571.00 |
| 7/23/2011 | $5,571.00 | $5,571.00 |
| 8/11/2011 | $5,571.00 | $5,571.00 |
| 8/11/2011 | $5,221.00 | $5,221.00 |
| 8/11/2011 | $5,571.00 | $5,571.00 |
| 9/7/2011 | $8,875.00 | $8,875.00 |
| 9/26/2011 | $3,918.00 | $3,918.00 |
| 9/27/2011 | $3,918.00 | $3,918.00 |
| 9/27/2011 | $3,918.00 | $3,918.00 |
| 10/1/2011 | $3,918.00 | $3,918.00 |
| 10/5/2011 | $3,918.00 | $3,918.00 |
| 7/15/2013 | $9,973.00 | $0.00 |
| 8/5/2013 | $9,072.00 | $0.00 |
| **Total** | **$84,798.00** | **$62,333.00** |

(J.A.195-210).

Additionally, there are restitution amounts requested for Tax Hawk (hereinafter "Tax Hawk") where there has been no allegation or connection to JEAN proven or alleged. These amounts totaled $1,125,364.00 where no actual damage occurred and $219,985.97 in actual damages. (J.A.195-210).

Additionally, there are restitution amounts requested for Tax Slayer (hereinafter "Tax Slayer") where there has been no allegation or connection to

JEAN proven or alleged. The amounts totaled $12,005.00 where no actual damage occurred and $3,999.00 in actual damages. (J.A.195-210).

Additionally, there are restitution amounts requested for Tax Act (hereinafter "Tax Act") where there has been no allegation or connection to JEAN proven or alleged. The amounts totaled $44,037.00 for non-actual damages and $29,562.00 in actual damages. (J.A.195-210).

Additionally, there are restitution amounts requested for H&R Block (Hereinafter "H&R Block") where there has been no allegation or connection to JEAN proven or alleged. The amounts totaled $291,858.00 non-actual damages and $118,075.00 in actual damages. (J.A.195-210).

Additionally, there are restitution amounts requested for non-specified (hereinafter "Non-Specified" restitution where JEAN does not know who the Government is alleging as a victim where there has been no allegation or connection to JEAN proven or alleged. The amounts totaled $33,380.00 for non-actual damages and $6,064.00 for actual damages.  (J.A.195-210).

**NON-SPECIFIED DAMAGES NOT ALLEGED IN INDICTMENT OR STATEMENT OF FACTS OR PLEA AGREEMENT**

| DATE | Amount of Restitution Claimed (Not Actual Damages) | Amount of Restitution Released (Actual Damages) |
|---|---|---|
| 1/18/2012 | $4,924.00 | $0.00 |
| 1/27/2012 | $3,999.00 | $0.00 |
| 2/6/2012 | $1,683.00 | $0.00 |
| 2/9/2012 | $9,996.00 | $0.00 |

| | | |
|---|---:|---:|
| 3/17/2012 | $2,500.00 | $0.00 |
| 3/30/2012 | $2,868.00 | $0.00 |
| 4/7/2012 | $3,500.00 | $3,500.00 |
| 3/31/2013 | $9,666.00 | $0.00 |
| | | $3,500.00 |
| | $8,131.00 | |
| | $5,221.00 | $0.00 |
| | $7,131.00 | $0.00 |
| | $5,221.00 | $0.00 |
| | $4,221.00 | $0.00 |
| | $7,965.00 | $0.00 |
| | | $2,564.00 |
| | $4,221.00 | $0.00 |
| | $5,221.00 | $0.00 |
| | $5,221.00 | $0.00 |
| | $5,221.00 | $0.00 |
| **Total** | **$27,849.00** | **$6,064.00** |

(J.A.195-210).

It appears that all of these damages did not have a causal link, were not mention in the *Statement of Facts* or *Plea Agreement* or *Indictment* or *Superseding Indictment.*

Finally, Turbo Tax damages, which are the only damages alleged against JEAN in the *Indictments* and *Statement of Facts*. There are restitution amounts requested totaling $796,501.00 for non-actual intended damages and $156,867.10 in actual damages. However, even with the damages for Turbo Tax, some of the alleged Turbo Tax damages do not have corresponding dates.

As such, the district court should have sentenced JEAN on the Turbo Tax losses alone. The district court should have stricken the other alleged losses should

46

as they have an insufficient nexus to JEAN. Accordingly, this Court should vacate

JEAN's sentence and the matter remanded.

**b.    The victims identified in this matter.**

The *Statement of Fact*s identifies a victim as **L.A.** stating that JEAN did

knowingly and unlawfully possess and use, without lawful authority, pre-paid debit

card bearing **L.A.**'s name.   (J.A.87).

Intuit, is a company that manufactures and supports software for use in

connection with the filing of federal income returns and manufactures and supports

the popular tax filing software known as "TurboTax" is identified in the *Statement*

*of Facts*. (J.A.87).

Also identified is **R.S.** , a victim the Government states was the name on a

pre-paid debit card that was used to make a payment toward the delinquent rent of

the storage facility.  **R.S.'s** card was issued via TurboTax.  (J.A.87).

While the *Statement of Facts* also states that **R.S's** pre-paid debit card had

been issued in connection with the filing of a fraudulent tax return and receipt of a

fraudulent tax refund, at the sentencing hearing, a different story emerged.

(J.A.87). The court questioned Agent Le Fevre about the  2012 Ratie Stewart

(Victim **R.S.**) return asking if that was a fraudulent return, and one that was not

genuinely filed by  Ms. Stewart or Mr. Stewart?

AGENT LE FEVRE:    We've had some difficulty contacting Ratie Stewart. However, the similar characteristics used to file that return, such as the earnings information and everything, matches other returns that appear to be fraudulent as well.  All of these returns have very, very, very similar income amounts, including interest income, wage amounts, withholding amounts, employer information, and a number of those have been verified as false.

(J.A.138).

In other words, the Government did not know at sentencing whether Ratie Stewart's (aka **R.S.**'s) return was fraudulent or not. Therefore, as taken as a whole, there were three victims identified to JEAN in the *Statement of Facts*, with all the fraudulent returns belonging to Intuit through Turbo Tax.

Therefore, the losses alleged to "non-specified," "H&R Block," "Unknown," "Tax Slayer,"  "Tax Hawk," and "dates out of purview" are outside of the charged offense and as identified in the *Indictment* or *Superseding Indictment*, *Plea Agreement* or *Statement of Facts*.  The district court's inclusion of these amounts as speculative damages and/or restitution in this case, results in an increase in the guidelines and is error, and this matter should be reversed and remanded.

### c. The historical practice of federal judges supports the principle that a showing of causation linking the specific offense to the victim's harm is integral to an award of restitution.

Black's Law dictionary defines actual damages as real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual

and real loss or injury, as opposed on the one hand to "nominal" damages, and on the other to "exemplary" or "punitive" damages.

The Supreme Court has limited restitution to losses caused by the specific conduct that is the basis of the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 420, 109 (1990) *Hughey v. United States*, 110 S. Ct. 1979 (1990) (holding "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order").

Historically, the practice of federal judges supports the principle that a showing of causation linking the specific offense to the victim's harm is integral to an award of restitution. *United States v. Church*, 701 F. Supp. 2d 814, 827 (W.D. Va. 2010), *see United States v. Berk*, 666 F. Supp. 2d 182, 187 (D. Me. 2009). An early example in our judicial system came with the passage of the Federal Probation Act in 1925, 18 U.S.C. § 3651 (repealed effective Oct. 12, 1984), whereby federal judges were authorized to impose criminal restitution as a condition of probation. *Id.* However, the courts were only permitted to require a defendant to pay restitution "to aggrieved parties *for actual damages or loss caused by the offense for which conviction was had*," which was interpreted to mean, "the amount involved in the particular offense for which the defendant was indicted and of which he was convicted." *Id. See United States v. Taylor*, 305 F.2d 183, 187 (4th Cir. 1962) (citing cases) (emphasis in original).

49

The defendant in *Taylor* was convicted of failing to file tax returns for 1956 and 1957 and filing a false return for 1955. The court awarded restitution to the Internal Revenue Service of a sum which included, *inter alia*, "any additional income tax that might be found to be due for the years 1958, 1959, and 1960, together with all applicable penalties and interests on said sums until date of payment." *Taylor,* 305 F.2d at 185. This Court in <u>Taylor</u> held the court exceeded its authority under the Probation Act by ordering restitution in an amount that exceeded the figure stated in the indictment and defendant's admitted subsequent tax liability. *Id*. at 187.

This Court also subsequently reiterated the holding in <u>Taylor,</u> stating an award of restitution under 18 U.S.C. § 3651 (repealed effective Oct. 12, 1984) required "that the precise amount of loss must be legally determined in the underlying criminal proceeding," and that this legal determination must be "of the exact amount of actual loss caused by the offense." *Church*, 701 F. Supp. 2d at 828, See *United States v. Stuver*, 845 F.2d 73, 76 (4th Cir. 1988). *See also United States v. Serhant*, 740 F.2d 548, 555 (7th Cir. 1984) (holding it was error for trial court to order restitution in a manner not limited to the "actual loss caused by the offenses" for which conviction was had); *Church*, 701 F. Supp. at 828, *United States v. Shelby*, 573 F.2d 971, 976 (7th Cir. 1978) (same).

Congress enacted detailed restitution provisions in the VWPA under which a district court may order a defendant to pay restitution to any victim of an offense of conviction. *Church*, 701 F. Supp. 2d at 828, *see* 18 U.S.C. § 3663(a)(1)(A). The statutory language in the VWPA makes clear the level of causation required in the context of the Federal Probation Act (or one greatly similar) is equally applicable to awards of restitution under the VWPA. *See* 18 U.S.C. § 3663(a)(2) (defining the term "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"). *Church*, 701 F. Supp. 2d at 828. The case law interpreting the restitution provisions of the VWPA lends further support to this proposition. *Church*, 701 F. Supp. 2d at 828.

Congress amended the VWPA in 1990 to allow broad restitution of offenses involving as "element of a scheme, a conspiracy, or pattern of criminal activity." *Crime Control Act of 1990, Pub. L. No. 101-647 § 2509, 104 Stat. 4789, 4863*.

In the instant matter, the Government has stated damages that are far beyond what the intent of the VWPA because the government cannot prove them and there is no causal link to JEAN. The government has not verified many of the losses as stated in **Issue I, II, and III** and they are seeking to restrict JEAN's liberty on speculation damages and "non-nexus" damages instead of actual damages. The result is a grossly overstated loss, which has excessively increased JEAN's guidelines.

51

In *Hughey*, 495 U.S. 411, the defendant pleaded guilty to one count of the unauthorized use of a credit card issued by MBank to a particular cardholder, but was ordered to pay restitution in the amount of MBank's losses resulting from defendant's alleged theft and use of 21 cards from MBank cardholders. The Supreme Court reversed the restitution order, holding "the language and structure of the VWPA make plain Congress' intent to authorize an award of restitution **only for the loss caused by the specific conduct that is the basis of the offense of conviction**." *Id.* at 413. "(*emphasis added.*).

`While not necessarily fixed by the description given in the corresponding charge itself, the award [of restitution under the VWPA] *may not include losses unrelated to the count of conviction*." *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996) (emphasis added) (citing *United States v. Bailey*, 975 F.2d 1028, 1033-34 (4th Cir. 1992)). Indeed, an award of restitution under the VWPA requires more of a showing than their simple relation to the count of conviction. *See In re Doe*, 264 F. App'x 260, 263 (4th Cir. 2007) ("[T]he mere fact that an injury is related to a crime is insufficient for restitution; there must be a 'direct and proximate' connection between the two to support an award under § 3663.").

The Mandatory Victims Restitution Act of 1996 (hereinafter "MVRA"), which provides a sentencing court shall award restitution to victims of certain categories of offenses. *See 18 U.S.C. § 3663A*. For those categories of offenses

52

specified therein, "[t]he MVRA differs from the VWPA by making clear that a district court is *required* to order a defendant to make restitution to the victim of a covered offense in the full amount of each victim's loss." *United States v. Roper, 462 F.3d 336, 338 (4th Cir. 2006)* (internal quotation marks omitted) (emphasis in original). Yet in spite of the express command of the MVRA mandating restitution under its provisions, again, Congress kept the familiar causation requirement found in the aforementioned restitution statutes. The definition of "victim" under the MVRA is "substantively identical" to that set forth in the VWPA, as both require that such an individual be "**directly and proximately harmed as a result of the commission of an offense."** *See United States v. Aguirre-Gonzalez*, 597 F.3d 46, 2010 WL 700201, at *3 (1st Cir. 2010) (citing *United States v. Chalupnik*, 514 F.3d 748, 753 (8th Cir. 2008)).

In a recent case, this Court reiterated this causation requirement, wherein it vacated a restitution order of a district judge under the MVRA. *See United States v. Llamas*, No. 09-4045, 599 F.3d 381, 2010 U.S. App. LEXIS 5509 (4th Cir. March 17, 2010) (published). In *Llamas*, the court held "the focus of [a sentencing] court in applying the MVRA must be on the losses to the victim *caused by the offense*." *Llama*, 2010 U.S. App. LEXIS 5509 at *23 (citing *United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003)) (emphasis in original).

The defendant (and others) in *Llamas* had operated a call center in Costa Rica that employed a sweepstakes scheme to bilk victims out of approximately $1.7 million, which were the losses proven to be attributable to that specific conspiracy offense for which the defendant was convicted. However, the district judge ordered defendant to pay restitution of more than $ 4.2 million, "concluding he was jointly and severally liable for losses caused not only by the Center, but also by other Costa Rican call centers utilizing similar sweepstakes schemes." *Llama*, 2010 U.S. App. LEXIS 5509 at *24. The court in <u>Llamas</u> held it was legal error for the district judge not to limit restitution to those losses attributable to the Center. *Id.*

It is a well-established principle in criminal restitution that the amount of restitution awarded to a victim may not exceed those losses caused by the particular offense of the defendant's conviction. *Id.* This principle is a consistent thread throughout the jurisprudence on the Federal Probation Act as well as the VWPA and the MVRA, and Congress enacted § 2259 against this backdrop. The Court notes the "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents and authorities that inform the analysis." *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486, 126 S. Ct. 1252, 163 L. Ed. 2d 1079 (2006). By defining the term "victim" as "the individual harmed as a result of a commission of

54

a crime under [Chapter 110]," § 2259(c), and including the modifier, "as a proximate result of the offense," to the definition of "full amount of the victim's losses," § 2259(b)(3), Congress marks the continuance of, rather than deviation from, well-established principles of restitution.

At the time of sentencing, the district court had not finalized JEAN's restitution and sentenced him through the guidelines on an estimation of damages and not actual damages. These damages were overstated and had no nexus to JEAN. This is a violation of his constitutional rights and resulted in an excessive sentence. The district court should have considered in sentencing only actual damages attributed to Turbo Tax, **L.A.,** and **R.S.**

## Issue III Conclusion

There was no causation linking any damages other than Turbo Tax to specific offenses for which JEAN was charged. Those are the damages that should have been used for sentencing. Without that link, the court erred in sentencing JEAN on estimated and speculated damages. Additionally, many of the losses occur out of time in the context of the crime charged. This error created excessive unsupportable intended and actual damages and/or restitution, which improperly increased JEAN's guidelines. The Court should reverse and remand his sentence.

## <u>OPENING BRIEF CONCLUSION</u>

For all of the reasons stated herein JEAN, respectfully requests this Court reverse or remand to the district court for resentencing and recalculation of the damages, guidelines, sentence and restitution order.

### <u>Supplemental Brief</u>

**JEAN RESPECTFULLY REQUESTS PERMISSION AND RESERVES THE RIGHT TO FILE A SUPPLEMENTAL BRIEF WHEN THE DISTRICT COURT MATTER IS FINALLY CONCLUDED**

### <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant, JEAN, asserts the arguments contained in this brief are complete and meritorious and do not require oral argument.  However, if the Court should determine oral argument would be helpful in weighing the merits of this appeal, Appellant would be glad to participate in such argument.

Respectfully Submitted,

**RAMOTH JEAN**

_____/s/_____

Rebecca S. Colaw, Esquire
Rebecca S. Colaw, P.C.
Virginia State Bar #47702
Attorney for **RAMOTH JEAN**
2470 Pruden Blvd
Suffolk, Virginia  23434
Telephone Number:  (757) 539-5020
Facsimile Number:  (757) 539-5743
rsc@colawlaw.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-4079        **Caption:** United States v. Ramoth Jean

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]    this brief contains ____12,630____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]    this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   Times New Roman, 14 Point _____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Rebecca S. Colaw _____

Attorney for appellant _____

Dated: 8/4/2014 _____

# CERTIFICATE OF SERVICE

I certify that on  August 4, 2014      the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Michael Calvin Moore
OFFICE OF THE U.S. ATTORNEY
Main Street Centre
600 East Main Street
Suite 1800
Richmond, VA 23219-2447
804-819-5408
Mike.C.Moore@usdoj.gov

/s/ Rebecca S. Colaw

Signature

8/4/2014

Date